UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>JOHNS-MANVILLE CORPORATION, et al.,<br><br><div align="center">Debtors.</div> | Chapter 11<br>Case Nos. 82 Br. 11656 (CGM) through<br>82 Br. 11676 (CGM) inclusive |
| In re:<br><br>MANVILLE FOREST PRODUCTS CORP.,<br><br><div align="center">Debtor.</div> | Chapter 11<br>Case Nos. 82 Br. 11659 (CGM) |
| LYDIA BERRY,<br><br><div align="center">Appellant,</div><br><div align="center">-against-</div><br><br>GRAPHIC PACKAGING INTERNATIONAL, INC.,<br><br><div align="center">Appellee.</div> | **ORDER**<br><br>16 Civ. 5817 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

Appellant Lydia Berry appeals from a June 30, 2016 order of the United States Bankruptcy Court for the Southern District of New York, enjoining Appellant's claims against Appellee Graphic Packaging International, Inc. ("Graphic") in her state court action, then pending in the Fourth Judicial District for the Parish of Ouachita in Louisiana (the "Louisiana Action"). For the reasons stated below, this Court finds that Appellant's arguments are without merit, and the decision of the Bankruptcy Court will be affirmed.

## BACKGROUND

### I.     FACTS

#### A.     The Louisiana Action

This case arises from the Louisiana Action, in which Appellant brings asbestos-related personal injury claims against several Defendants, including Appellee, seeking to recover for her exposure to asbestos from her husband's work at premises owned by Appellee (the "Mill") from 1973 until 2010. (App't App'x (Dkt. No. 15) at A0039-47) Appellant testified in the Louisiana Action that her exposure was to asbestos fibers that travelled from the Mill to her home on Mr. Berry's work clothes, which she laundered. (Id. at A0031) Appellant alleges that due to her exposure to asbestos, she "contracted malignant mesothelioma . . . diagnosed on or around March 10, 2015." (Id. at A0042) Appellee was the only "premises defendant" in the Louisiana Action. (Id. at A0035)

#### B.     The Bankruptcies

The Mill is located in West Monroe, Louisiana, and at the time Mr. Berry started working there, it was owned by OlinKraft, Inc. (Id. at A0032) As a result of a 1979 merger and 1980 name change, Manville Forest Products Corporation ("MFP") became the owner of the Mill. (Id.) In 1982, MFP, its parent company Johns-Manville Corporation ("Manville"), and their affiliates filed a Chapter 11 bankruptcy petition in this District. (Id. at A0033) On March 26, 1984, the Bankruptcy Court confirmed MFP's Plan of Reorganization (the "MFP Plan"), and on December 22, 1986, the Bankruptcy Court confirmed Manville's Second Amended and Restated Plan of Reorganization (the "Manville Plan"). (Id.) In 1991, MFP changed its name to Riverwood International Corporation ("Riverwood"). (Id. at A0034) In 2003, Appellee merged

with Riverwood, with Riverwood as the surviving entity.  (Id.)  Upon the completion of the

merger, Riverwood changed its name to "Graphic Packing International, Inc."  (Id. at A0034-35)

Manville was "a diversified manufacturing, mining and forest products

company," and by the 1970s had become "the world's largest miner, processor, manufacturer

and supplier of asbestos and asbestos-containing products."  GAF Corp. v. Johns-Manville Corp.

(In re Johns-Manville Corp.), 26. B.R. 405, 407 (Bankr. S.D.N.Y 1983), aff'd sub nom. Johns-

Manville Corp. v. Asbestos Litig. Grp. (In re Johns-Manville Corp.), 40 B.R. 219 (S.D.N.Y.

1984).  The primary reason for the MFP and Manville bankruptcies was asbestos litigation.  In re

Johns-Manville Corp., 36 B.R. 743, 745 (Bankr. S.D.N.Y. 1984), aff'd, 52 B.R. 940 (S.D.N.Y.

1985) ("It is the spectre of proliferating, overburdening [asbestos] litigation to be commenced in

the next 20-30 years, which litigation would be beyond the company's ability to manage, control,

and pay for, which has prompted this filing.")  A 1982 study commissioned by Manville

projected that 45,000 asbestos-related cases might be filed against the company.  Id. at 746.

While Manville had $600 million in insurance coverage through approximately 100 policies

issued by 25 insurers, these insurers "by and large refused to provide defense and indemnity to

Manville in asbestos cases."  Id. at 750.

## II.   **PROCEDURAL HISTORY**

The Louisiana Action was filed on August 24, 2015, in the Fourth Judicial

District for the Parish of Ouachita in Louisiana.  (App't App'x (Dkt. No. 15) at A0039)  On

February 29, 2016, Appellee filed the instant action, an emergency motion to enforce the MFP

and Manville confirmation orders, and to enjoin the claims against it in the Louisiana Action.

(Mot. (Dkt. No. 4204), 82 Br. 11656)  At that point in time, the Louisiana Action was set for trial

on April 4, 2016, with a number of deadlines and depositions soon approaching.  (Lockridge Aff. (Dkt. No. 4206) ¶¶ 20, 24-25, 82 Br. 11656)

On March 14, 2016, Chief Bankruptcy Judge Cecilia G. Morris granted a stay of the claims against Appellee in the Louisiana Action, pending a decision on the motion.  (Dkt. No. 4224, 82 Br. 11656)  On June 30, 2016, Chief Judge Morris issued a memorandum opinion and an order granting Appellee's motion and enjoining the claims against Appellee in the Louisiana Action.  (Dkt. Nos. 4243 & 4244, 82 Br. 11656)

On July 21, 2016, Appellant filed a notice of appeal, which was assigned to this Court.  (Dkt. No. 1)

## III.  THE BANKRUPTCY COURT'S OPINION

In her June 30, 2016 opinion, Chief Judge Morris finds that she has subject matter jurisdiction over Appellee's motion because it "is a 'core proceeding' under 28 U.S.C. § 157(b)(2)(A), matters concerning the administration of the estate, and § 157(b)(2)(I), [and] proceedings to determine the dischargeability of debt."  (June 30, 2016 Op. (Dkt. No. 4243) at 3, 82 Br. 11656)[1]  Judge Morris further notes that the Bankruptcy Court "retains jurisdiction to clarify its prior confirmation orders, to enforce its injunctions, and to adjudicate matters having to do with the administration of the confirmed chapter 11 plans of MFP and Manville."  (Id.)

After explaining the relevant definition of "claim" and the possible tests for determining when a claim arises, Judge Morris "concludes that under the relationship test set forth by the Second Circuit, a sufficient relationship is formed when the claimant is exposed to the asbestos as a result of the debtor's allegedly tortious conduct."  (Id. at 23)  Applying that test,

---

[1]  The page numbers of documents referenced in the remainder of this Order correspond to the page numbers designated by this District's Electronic Case Files system.

4

Judge Morris finds that for any claim Appellant may have against MFP, "her prepetition exposure to asbestos would give rise to a prepetition claim under the Bankruptcy Code."  (Id.) Judge Morris further concludes that Appellant's "continuing theory of exposure," in which she had been exposed both pre- and post-petition, does not alter the conclusion that "prepetition exposure to asbestos giving rise to a post-petition injury manifesting constitutes a prepetition claim in bankruptcy."  (Id. at 23-27)

Judge Morris also finds that "MFP complied with the due process requirements" set forth in Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950), as "MFP gave publication notice of the bankruptcy proceedings and the bar date . . . [which] is sufficient in a bankruptcy proceeding where the identity of the creditor is unknown and not reasonably ascertainable."  (Id. at 30)

Judge Morris then notes that the Manville Plan was "designed to treat both present asbestos claimants and future asbestos claimants equally," and that the Manville Trust "was carefully designed to ensure a continuing source of funds would be available to replenish the corpus of the Trust, so that all asbestos victims could be paid."  (Id. at 37-38)  Judge Morris then describes the injunction that the Manville Plan provides, which "'applies to any suit to recover "on or with respect to any Claim, Interest or Other Asbestos Obligation." . . . The future claimants are subject to the Injunction under the rubric of "Other Asbestos Obligation," which is defined by the Plan as asbestos-related health liability caused by pre-petition exposure to Manville asbestos, regardless of when the individual develops clinically observable symptoms.'" (Id. at 39 (quoting Kane v. Johns-Manville Corp., 843 F.2d 636, 640 (2d Cir. 1988))  Judge Morris concludes that Appellant "holds an 'Other Asbestos Obligation' as defined under the

Manville Plan and as interpreted by [the] Court," and accordingly her "claim is channeled to the Manville Trust." (Id. at 39-40)

Judge Morris rejects Appellant's argument that "the definition of subsidiary does not specifically include MFP," finding that the Manville confirmation order's definition of "Other Asbestos Obligations" "clearly enjoins suit against subsidiaries of Manville" such as MFP. (Id. at 44-45) Finally, Judge Morris concludes that "[t]he discharge injunction provided by the Bankruptcy Code is not extinguished by a debtor's initial failure to assert the protection of the injunction," and accordingly Appellee had not waived its right to seek an injunction under the MFP and Manville confirmation orders. (Id. at 48-49)

Judge Morris then issued an order enjoining Appellant's claims against Appellee, and any potential claims against Manville or MFP, that sought "to recover for any injuries resulting from her exposure to asbestos. . . ." (Id. at 49)

## IV.   THE APPEAL

The notice of appeal was filed on July 21, 2016. (Dkt. No. 1) In her appeal, Appellant presents eleven issues, which generally fall into three categories: (1) the timing of her claim; (2) subject matter jurisdiction; and (3) procedural due process. (App't Br. (Dkt. No. 14) at 16-18)

## DISCUSSION

## I.   STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 158(a)(1), district courts are vested with appellate jurisdiction over bankruptcy court rulings. When sitting as an appellate court, the district court may "affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such

appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."  28 U.S.C. § 2106.  "A district court reviews a bankruptcy court's findings of fact for clear error. . . ."  In re Bernard L. Madoff Inv. Sec. LLC, 531 B.R. 345, 350 (S.D.N.Y. 2015) (citing In re Bell, 225 F.3d 203, 209 (2d Cir. 2000); In re Metaldyne Corp., 421 B.R. 620, 624 (S.D.N.Y. 2009)).

A finding of fact is clearly erroneous where,

> "although there is evidence to support it, the . . . court on the entire record is left with the definite and firm conviction that a mistake has been committed."  United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).  While the trial court's findings of fact are not conclusive on appeal, the party that seeks to overturn them bears a heavy burden.  See 9C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2585 (1995).  If two views of evidence are possible, the trial judge's choice between them cannot be clearly erroneous.  See Anderson v. City of Bessemer, 470 U.S. 564, 574 (1985). "To be clearly erroneous, a decision must strike [the reviewing court] as more than just maybe or probably wrong; it must . . . strike [the reviewing court] as wrong with the force of a five-week-old, unrefrigerated dead fish."  Parts & Elec. Motors, Inc. v. Sterling Elec., Inc., 866 F.2d 228 (7th Cir.), cert. denied, 493 U.S. 847 (1989).

H & C Dev. Group, Inc. v. Miner (In re Gregory & Dawn Miner), 229 B.R. 561, 565 (B.A.P. 2d Cir. 1999).

A bankruptcy judge's conclusions of law are reviewed de novo.  Official Comm. of Unsecured Creditors of AppliedTheory Corp. v. Halifax Fund, L.P. (In re AppliedTheory Corp.), 493 F.3d 82, 85 (2d Cir. 2007).

## II.    WHETHER APPELLANT HAS A PRE-PETITION CLAIM

### A.    Applicable Law

Under the Bankruptcy Code, a claim is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  11 U.S.C. § 101(5)(A).  "[T]he term 'claim' is sufficiently broad to encompass any possible right to payment."  In re Mazzeo,

131 F.3d 295, 302 (2d Cir. 1997)  "[T]he existence of a valid bankruptcy claim depends on (1) whether the claimant possessed a right to payment, and (2) whether that right arose before the filing of the petition."  In re Chateaugay Corp., 53 F.3d 478, 497 (2d Cir. 1995)  "A claim will be deemed to have arisen pre-petition if 'the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation – "a right to payment" – under the relevant non-bankruptcy law.'"  In re Manville Forest Prod. Corp., 209 F.3d 125, 129 (2d Cir. 2000) (quoting id.).  "If the right to payment is contingent on future events, the claim must instead 'result from pre-petition conduct fairly giving rise to that contingent claim.'"  In Matter of Motors Liquidation Co., 829 F.3d 135, 156 (2d Cir. 2016) (quoting In re Chateaugay Corp., 944 F.2d 997, 1005 (2d Cir. 1991)).  A "creditor need not have a cause of action that is ripe for suit outside of bankruptcy in order for it to have a pre-petition claim for purposes of the [Bankruptcy] Code."  In re Caldor, Inc.-NY, 240 B.R. 180, 192 (Bankr. S.D.N.Y. 1999) (internal quotation marks and citation omitted).

　　　　　The Second Circuit has not addressed the pre-petition "relationship" test in the asbestos context.  However, bankruptcy courts in this jurisdiction have held that asbestos claims arise at the time of exposure pre-petition, rather than at the time the injury manifests.  In re Waterman SS Corp., 141 B.R. 552, 556 (Bankr. S.D.N.Y. 1992) (holding that "the claims arose at the moment the Asbestosis Claimants came into contact with the asbestos," and noting that this "determination is based on the [Bankruptcy] Code's definition of 'claim,' the legislative history surrounding 11 U.S.C. § 101(5), and the cornerstone theory of bankruptcy, the 'Fresh Start.'"); In re Quigley Co., Inc., 383 B.R. 19, 27 (Bankr. S.D.N.Y. 2008) ("[A]n Asbestos [] Claimant's pre-petition exposure to asbestos gave rise to a 'claim,' regardless of whether the law of any particular state renders the cause of action unenforceable until some future contingency

occurs.  If the Asbestos [] Claimant was exposed to asbestos before the [] petition date, he or she holds a 'claim.' . . . [T]he claimant's status in bankruptcy does not depend on the manifestation of the injury, or on a state or court-made rule that delays enforcement of the cause of action unless and until the injury becomes manifest."); see also In re Grossman's Inc., 607 F.3d 114, 125 (3d Cir. 2010) (noting "something approaching a consensus among the courts that a prerequisite for recognizing a 'claim' is that the claimant's exposure to a product giving rise to the 'claim' occurred pre-petition, even though the injury manifested after the reorganization.")

### B.  Analysis

Appellant argues that the Bankruptcy Court erred in "finding that Mrs. Berry's asbestos injury arose as the result of pre-petition and not post-petition exposure to asbestos." (App't Br. (Dkt. No. 14) at 37)  Appellant makes several points in support of this argument, and this Court addresses each in turn.

### 1.  Whether Appellant's Claim is Pre-Petition As a Matter of Bankruptcy Law

Appellant contends that the Bankruptcy Court improperly relied on bankruptcy cases for the proposition that her claims arose pre-petition, arguing that in those cases "the injured claimant had been exposed to a manufacturer's asbestos exclusively before its bankruptcy case was filed."  (Id. at 41-42)  She argues that those cases "do not stand for the proposition that exposure to asbestos in and of itself results in an injury, or for the proposition that earlier exposures to asbestos necessarily [are] the cause of the injury," but rather "for the proposition that a contingent, unliquidated claim arises under section 101 of the Bankruptcy Code when an individual is exposed to asbestos."  (Id. at 42)  The cases cited by the Bankruptcy Court demonstrate, however, why Appellant's claim arose at first exposure under the pre-petition relationship test.

A tort claim like Appellant's – whether sounding in negligence or in products liability – has four elements:  duty, breach of the duty, causation, and injury.  63 Am. Jur. 2d Products Liability § 209 ("[A] products liability action based on negligence . . . must, as in any negligence case, allege that the defendant owed the plaintiff a duty of care, the defendant breached this duty or violated the standard of care, and the breach or violation was the cause in fact of some legally cognizable damage or loss to the plaintiff.").  In the asbestos cases cited by Judge Morris, bankruptcy courts have applied the relationship test so as to not require a pre-petition injury.  See, e.g., Quigley, 383 B.R. at 27 ("[i]f the Asbestos [] Claimant was exposed to asbestos before the [] petition date, he or she holds a 'claim.'"); Waterman, 141 B.R. at 556 ("the claims arose at the moment the Asbestosis Claimants came into contact with the asbestos").  Given that no pre-petition injury is required, the requirement of causation has obviously been relaxed.

Accordingly, under the case law cited by Judge Morris, a pre-petition relationship exists for purposes of an asbestos claim once there is a duty and a breach of that duty.  Given the toxic nature of asbestos, the elements of both duty and breach occur at the time of first exposure, which in this case is indisputably pre-petition.  This conclusion is consistent with the approach in Waterman, in which the court held that "a claim arises at the moment when acts giving rise to the alleged liability are performed."  Waterman, 141 B.R. at 556.  Accordingly, Appellant has a pre-petition claim, despite the fact that the exposure continued post-petition.

Appellant has cited no bankruptcy case in which a litigant with both pre- and post-petition asbestos exposure was allowed to pursue a claim in state court.  Acknowledging the absence of Second Circuit authority on this point, the holdings of lower courts are consistent with the Bankruptcy Code, under which a "claim" is defined broadly.  See In re Mazzeo, 131

F.3d at 302 ("[T]he term 'claim' is sufficiently broad to encompass any possible right to payment."). The Eleventh Circuit has applied the pre-petition relationship test similarly in the tort context: "an individual has a § 101(5) claim against a debtor manufacturer if [] events occurring before confirmation create a relationship, such as contact, exposure, impact, or privity, between the claimant and the debtor's product." Epstein v. Official Comm. of Unsecured Creditors of Estate of Piper Aircraft Corp., 58 F.3d 1573, 1577 (11th Cir. 1995).

This Court concludes that the Bankruptcy Court correctly determined that, for purposes of federal bankruptcy law, Appellant's asbestos claim arose pre-petition, at the time of first exposure to asbestos.

### 2. Appellant's "Continuing Theory of Exposure"

Appellant objects to the Bankruptcy Court's analysis of her "continuing theory of exposure," making three arguments. First, Appellant argues that the Bankruptcy Court incorrectly states that "'Ms. Berry's papers acknowledge that her earlier exposures to asbestos were more likely to have contributed to her contraction of mesothelioma, as opposed to the later exposures.'" (App't Br. (Dkt. No. 14) at 37 (quoting June 30, 2016 Op. (Dkt. No. 4243) at 24, 82 Br. 11656)) Second, Appellant argues that "[t]he issue of which exposures caused the asbestos injury is an issue that should be left to a jury to determine with the benefit of a fully developed evidentiary record." (Id. at 40) Third, Appellant argues that "state law cases relied on by the Bankruptcy Court . . . do not support its conclusion that Mrs. Berry's pre-petition exposures caused her mesothelioma." (Id. at 48) The Bankruptcy Court rejected all of these arguments, finding that Appellant's "papers and her own state court witness admit that there is no way to determine at what point her cumulative exposure to asbestos became sufficient to cause her illness." (June 30, 2016 Op. (Dkt. No. 4243) at 24, 82 Br. 11656)

11

As an initial matter, this Court agrees with Appellant that the Bankruptcy Court erred in stating that "[t]he substantial injury producing exposures here, by Ms. Berry's own admission, were more likely to have occurred prior to the confirmation date."  (Id. at 24-25) Before the Bankruptcy Court, Appellant argued that "it is more likely that Mrs. Berry's mesothelioma was caused by her post-March 26, 1984 exposure to asbestos. . . ."  (App't App'x (Dkt. No. 15) at A1516)

The Bankruptcy Court's analysis does not turn on Appellant's purported concession in her briefing, however.  To the contrary, the Bankruptcy Court relied on a point that is undisputed:  that "there is no way to prove the prepetition exposure did not cause [Appellant's] mesothelioma."  (June 30, 2016 Op. (Dkt. No. 4243) at 24, 82 Br. 11656)  In this regard, the Bankruptcy Court analyzed a Louisiana Supreme Court decision which found that the "'lengthy latency period [of asbestos injuries] renders efforts to pinpoint the date on which the diseases was contracted virtually impossible, medically and legally.'"  (Id. at 25 (quoting Cole v. Celotex Corp., 599 So. 2d 1058, 1066 (La. 1992)))  In discussing Cole, the Bankruptcy Court was not making a finding as to when Appellant's injury arose under Louisiana law, but instead was explaining that it would be impossible to demonstrate when exactly her injury arose under Louisiana law.

Acknowledging that the Bankruptcy Court incorrectly stated that Appellant had conceded that her injury was more likely caused by pre-petition exposures, the dispositive point under federal bankruptcy law – which is the law that governs the determination as to whether Appellant's claim is pre-petition – is that Appellant concedes that she was first exposed to asbestos pre-petition.  (See App't Br. (Dkt. No. 14) at 21, 37)  It is therefore irrelevant what Appellant purportedly conceded about the relative impacts of different exposures; what

12

Louisiana state law has held on this point; whether expert testimony was considered; or what a state court jury might conclude about the relative impacts of different exposures.

### 3.    Whether the Bankruptcy Court Made a Factual Finding that Denied Appellant Due Process

Appellant contends that, "[b]y reaching a dispositive factual determination in Mrs. Berry's tort action, the Bankruptcy Court denied Mrs. Berry both procedural and substantive due process with respect to her personal injury claim."  (Id. at 36)  As discussed above, however, the Bankruptcy Court made a finding of law, not of fact.  Moreover, the Bankruptcy Court's legal ruling was based on undisputed evidence as to when the first exposure occurred.  Accordingly, Appellant was not denied procedural nor substantive due process.

### 4.    Whether *Motors Liquidation* Requires A Different Result

Finally, Appellant argues that her "claims based on MFP's post-petition conduct are not claims based on a right to payment that arose before the filing of MFP's petition or based on pre- petition conduct.  Accordingly, such claims were not bankruptcy claims in MFP's bankruptcy. . . ."  (App't Br. (Dkt. No. 14) at 76)  In support of this proposition, Appellant cites to Motors Liquidation, 829 F.3d 135.  (Id.)

In Motors Liquidation, "the bankruptcy court held that [the] New GM could not be sued – in bankruptcy court or elsewhere – for ignition switch claims that otherwise could have been brought against [the] Old GM, unless those claims arose from [the] New GM's own wrongful conduct."  Motors Liquidation, 829 F.3d at 151.  On appeal, the Second Circuit held that "claims [] based on [the] New GM's post-petition conduct [] are not claims that are based on a right to payment that arose before the filing of petition or that are based on pre-petition conduct.  Thus, these claims are outside the scope of the Sale Order's 'free and clear' provision."  Id. at 157.

Appellant's claim is not comparable to those at issue in <u>Motors Liquidation</u>.  That case involved faulty ignition switches made by the Old GM, which filed a bankruptcy petition on June 1, 2009.  On July 10, 2009, the Old GM was replaced by the New GM, which did not issue a recall until February 2014.  <u>Id.</u> at 145, 147, 150.  Given these circumstances, it was clear that a jury could properly determine that the New GM was liable for misrepresentations it made about the safety of cars made by the Old GM.  <u>Id.</u> at 157.

The circumstances here are quite different.  As to numerous post-petition claims arising from asbestos exposure, the latency between exposure and injury makes it impossible to determine what circumstances led to the injury.  Accordingly, as a matter of bankruptcy law, courts have determined that these asbestos claims arose at the time of exposure.  The faulty ignition switches at issue in <u>Motors Liquidation</u> presented no such latency issue.  There was thus no need to make a determination as to whether the Old GM bore sole responsibility for post-petition injuries.  Indeed, as the Second Circuit noted, the "claims [at issue] are based on New GM's <u>post</u>-petition conduct, and are not claims that are based on a right to payment that arose before the filing of petition or that are based on pre-petition conduct."  <u>Motors Liquidation</u>, 829 F.3d at 157 (emphasis in original).  The opposite is true here.

\*       \*       \*       \*

For all of these reasons, this Court concludes that the Bankruptcy Court correctly found that Appellant has a pre-petition claim.

### III.   WHETHER THE BANKRUPTCY COURT
### HAD SUBJECT MATTER JURISDICTION

Appellant contends that the Bankruptcy Court lacked subject matter jurisdiction. (App't Br. (Dkt. No. 14) at 26)

### A.   Applicable Law

28 U.S.C. § 157 provides that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11 . . . ."  28 U.S.C. § 157(a).  "[C]ore proceedings" include "matters concerning the administration of the estate" and "determinations as to the dischargeability of particular debts." Id. § 157(b).  "11 U.S.C. §1142 confers limited post-confirmation jurisdiction upon the bankruptcy court for the purpose of implementing the plan."  In re Neptune World Wide Moving, Inc., 111 B.R. 457, 462 (Bankr. S.D.N.Y. 1990).  Finally, "a Bankruptcy Court plainly ha[s] jurisdiction to interpret and enforce its own prior orders."  Travelers Indem. Co. v. Bailey, 557 U.S. 137, 151 (2009).

### B.   Analysis

According to Appellant, "the Bankruptcy Court improperly exceeded its jurisdiction by making a finding concerning a key contested fact in the State Court Action[,] [and] . . . relied on that fact to enjoin all of Mrs. Berry's claims against Graphic Packaging." (App't Br. (Dkt. No. 14) at 31 (emphasis in original))  Appellant concedes, however, that

> [i]f the [Bankruptcy] Court concluded, as it did, that future asbestos claims were discharged in the MFP bankruptcy case and enjoined and channeled by the Manville bankruptcy case (conclusions disputed by Appellant as addressed below), the Court's jurisdiction permitted enforcement of those provisions by an order that enjoined Mrs. Berry from pursuing recovery from Graphic Packaging in the State Court Action on the basis of exposure to asbestos carried home from the Paper Mill before the MFP bankruptcy was filed (i.e., the pre-petition exposures).

(Id.)

As discussed above, this Court finds that the Bankruptcy Court correctly concluded that Appellant was barred from bringing any asbestos-related claim against Appellee, because any such claim is a pre-petition claim.  While Appellant attempts to distinguish between pre- and post-petition asbestos exposure, as explained above, any such distinction is irrelevant under federal bankruptcy law.  Accordingly, the Bankruptcy Court did not exceed its jurisdiction by enjoining all of Appellant's claims.

Appellant next contends that "[t]he Bankruptcy Court based its decision on a dispositive factual finding . . . that exceeded its jurisdiction."  (Id. at 32)  As is also explained above, the Bankruptcy Court's decision was based on a legal conclusion, and not on a factual finding.  Accordingly, this argument provides no basis for this Court to find that the Bankruptcy Court exceeded its jurisdiction.

This Court concludes that the Bankruptcy Court had subject matter jurisdiction over Appellee's motion, because the motion "is a 'core proceeding' under 28 U.S.C. § 157(b)(2)(A), matters concerning the administration of the estate, and § 157(b)(2)(I), proceedings to determine the dischargeability of debt."  (June 30, 2016 Op. (Dkt. No. 4243) at 3, 82 Br. 11656)  The Bankruptcy Court also "retains jurisdiction to clarify its prior confirmation orders, to enforce its injunctions, and to adjudicate matters having to do with the administration of the confirmed chapter 11 plans of MFP and Manville."  (Id.)  The Bankruptcy Court's exercise of subject matter jurisdiction was appropriate under either theory.

## IV.   APPELLANT WAS AFFORDED PROCEDURAL DUE PROCESS

### A.   Applicable Law

"[A] fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise

interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane, 339 U.S. at 314. "The notice must . . . reasonably [] convey the required information, . . . [and] afford a reasonable time for those interested to make their appearance . . . ." Id. (citations omitted). "The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." Id. at 315.

In a bankruptcy proceeding, "a claim cannot be discharged if the claimant is denied due process because of lack of adequate notice." DPWN Holdings (USA), Inc. v. United Air Lines, Inc., 747 F.3d 145, 150 (2d Cir. 2014). "The proper inquiry is whether the [party giving notice] acted reasonably in selecting means likely to inform persons affected, not whether [the intended recipient] actually received notice." Weigner v. City of New York, 852 F.2d 646, 649 (2d Cir. 1988).

"[I]n the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights." Mullane, 339 U.S. at 317 (citations omitted).

### B.   Analysis

Appellant contends that, in the context of asbestos claims, "publication notice does not satisfy the touchstone of due process that notice be reasonably calculated to apprise the claimants of their rights." Accordingly, "due process for future asbestos claimants may only be satisfied through representation." (App't Br. (Dkt. No. 14) at 55) Appellant further contends that "it is impossible to provide an unmanifested asbestos claimant with adequate notice." (Id. at 56) Due process thus requires "the appointment of a future claimants' representative to serve as

a fiduciary."  While such a representative was appointed in the Manville case, none was appointed in the MFP case.  (Id. at 56-57)

Appellant cites a number of bankruptcy cases in which publication notice was found to be insufficient, including in the Manville bankruptcy.  (Id. at 61-66)  She then argues that the two publication notices in the MFP case – "the Notice of Deadline for Creditors of Manville Forest Products Corporation to File Proofs of Claim (the 'Bar Date Notice') and [] the Notice of Hearing on Disclosure Statement of Manville Forest Products Corporation (the 'Notice of Disclosure Statement Hearing')" – were insufficient.  (Id. at 71)  According to Appellant, the Bar Date Notice "does not mention asbestos"; "is not written in simple English"; and "requires that claims be filed immediately. . . ."  (Id. at 71-72)  The Notice of Disclosure Statement Hearing suffers from similar deficiencies.  (Id. at 72)

Appellant appears to concede, however, that adequate notice was provided with respect to the Manville bankruptcy:  "The Johns Manville model has since been codified and is the exclusive way in which a debtor may obtain an injunction against asbestos future claims."  (Id. at 66)  Accordingly, this Court understands Appellant to contend that the Bankruptcy Court erred in finding that "[t]he content of MFP's publication notices were more than sufficient to alert any potential claimant of the conjoined nature of the MFP and Manville bankruptcy proceedings."  (June 30, 2016 Op. (Dkt. No. 4243) at 30, 82 Br. 11656)  In other words, Appellant is arguing that while the notice of the Manville bankruptcy was sufficient with respect to future claims, the same process was not followed with respect to MFP, rendering MFP's notice insufficient.

Appellant has cited no authority suggesting that – where both a parent corporation and its subsidiary have filed bankruptcy petitions – both the parent and the subsidiary must have

their own future claims representatives.  To the contrary, the Manville Plan explicitly enjoins and channels actions "with respect to any Claim, Interest, or Other Asbestos Obligation . . . against or affecting the Debtors [or] any of the Debtors' Subsidiaries. . . ."  (App't App'x (Dkt. No. 15) at A0342-43)  "Subsidiary" is defined as "any corporation or other entity of which securities or other ownership interest . . . are at the time directly or indirectly owned by such Person."  That definition clearly encompasses MFP.  (Id. at A0316)  "Other Asbestos Obligation" is defined as

> all debts, obligations or liabilities . . . to the extent caused or allegedly caused, directly or indirectly, by exposure to asbestos (alone or as contained in asbestos-containing products) and arising or allegedly arising, <u>directly or indirectly</u>, from acts or omissions prior to the Confirmation Date of one or more of the Debtors[.]

(Id. at A0313 (emphasis added))

Appellant's claim is clearly an "Other Asbestos Obligation," because her injury arose – at least indirectly – from the pre-confirmation actions of Manville, which indirectly owned and operated the Mill through its ownership of MFP.  Manville also manufactured asbestos that was brought to the Mill.  Indeed, Appellant's husband – who brought the asbestos fibers home – "sought recovery against the Manville Asbestos Trust . . . based on Manville's liability for manufacturing [asbestos]."  (App't Br. (Dkt. No. 14) at 87)  Accordingly, while Appellant claims that she had no notice of MFP's bankruptcy, it remains true that the Manville Plan – for which she does not contest the adequacy of notice – enjoins her claim.

In this regard, the Court notes that Judge Morris found that both MFP Notices contained the Manville case caption; "explicitly stated that all pre-petition claims arising prior to August 26, 1982 against MFP would be forever barred"; and "advised claimants who had already filed proofs of claim in the Manville case to file amended proofs of claim against MFP specifically."  (June 30, 2016 Op. (Dkt. No. 4243) at 30-31, 82 Br. 11656 (citing App't App'x (Dkt. No. 15) at A1664, A1667))  Judge Morris also found that "at least some of MFP's

employees in Louisiana had actual knowledge by 1983 that any action against MFP could not proceed without Manville and would require consideration of the effect on Manville's bankruptcy case." (Id. at 31-32)  Judge Morris cited a Louisiana Bankruptcy Court ruling that "makes it clear that MFP's bankruptcy proceedings were intertwined with Manville's, and that asbestos liability would play a factor in MFP's ability to reorganize." (Id. at 33 (citing In re Johns-Manville Corp., 34 B.R. 587, 590 (Bankr. W.D. La. 1983)))  Judge Morris further noted that "Mr. Berry filed his claim for asbestos injuries with the Manville Trust.  It is hard to imagine that Ms. Berry could have been completely unaware that the Mill filed for bankruptcy, or that MFP's bankruptcy was linked to Manville's bankruptcy and asbestos litigation." (Id.)  These findings buttress the effectiveness of the combined notice for the MFP and Manville bankruptcies.

Appellant also argues that she was denied a "particularized analysis of her specific facts and circumstances and a determination as to whether publication notice of the MFP Bar Date and Notice of Disclosure Statement Hearing provided her with constitutionally adequate due process. . . ." (App't Br. (Dkt. No. 14) at 78-79)  In support of this proposition, Appellant cites Grossman's, which held that [w]hether a particular claim has been discharged by a plan of reorganization depends on factors applicable to the particular case and is best determined by the appropriate bankruptcy court or the district court." Grossman's, 607 F.3d at 127.  But such a particularized analysis would make no difference here, where Appellant has conceded that the Manville Plan provided sufficient notice, and this Court has found that the Manville Plan discharged Appellant's claim.

Finally, Appellant argues that "the Manville future claimants' representative could not have represented Mrs. Berry in connection with her claims against MFP because the

order appointing the future claimants['] representative in Manville's bankruptcy case was entered approximately four months after confirmation of the MFP Plan." (App't Br. (Dkt. No. 14) at 84)  This argument is not persuasive.  Appellant does not suggest that she was pursuing a claim during that four-month period.  Accordingly, the contention that there was some time period during which she was unrepresented is irrelevant.  Once the future claimants' representative was appointed in 1984, that party became responsible for pre-petition claims, whenever they were eventually made.

This Court concludes that the notice of the MFP and Manville bankruptcies satisfies due process requirements with respect to future pre-petition asbestos claims against MFP, including Appellant's claim.

## V.     APPELLANT'S REMAINING ARGUMENTS

### A.     Whether MFP's Liability is Derivative of Manville's Liability

Appellant contends that, under 11 U.S.C. § 524(g), a bankruptcy court may enjoin "claims against a third party" and channel them into the bankruptcy only in specific circumstances that are not present here.  (App't Br. (Dkt. No. 14) at 83)  In this regard, Appellant argues that MFP's liability "is not derivative of Manville's," but is independent.  (App't Br. (Dkt. No. 14) at 84)  According to Appellant, "MFP's liability is for premises liability and sounds in negligence," whereas Manville's liability is based on "manufacturing and placing into the stream of commerce toxic asbestos and asbestos-containing products."  (Id. at 87-88)

As an initial matter, Judge Morris did not enjoin Appellant's claim pursuant to 11 U.S.C. § 524(g).  Instead, Judge Morris discharged Appellant's claim pursuant to 11 U.S.C. § 524(a)[2], noting that "[t]he discharge operates to void a judgment of personal liability against the

_____

[2] "A discharge in a case under this title – (1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to

21

debtor at any time obtained where that judgment is for a dischargeable debt." (June 30, 2016 Op. (Dkt. No. 4243) at 48-49, 82 Br. 11656)  Accordingly, it is irrelevant whether a discharge of MFP's liability is permitted by Section 524(g).

Moreover, MFP's liability is in fact derivative of Manville's.  As explained above, for channeling purposes, all that matters is that Appellant's claim "arise[s] directly or indirectly" from Manville's acts or omissions.  (App't App'x (Dkt. No. 15) at A0313)  The particular theory of liability is irrelevant to this analysis as long as Manville's manufacture and placement of asbestos products indirectly led to Appellant's injuries.  Accordingly, for purposes of Appellant's claim, MFP's liability is derivative of Manville's liability.

### B.  Whether the MFP Plan Provided Compensation

Appellant argues that the MFP Plan made "[n]o provision . . . for individuals who would later develop injuries for which MFP was liable as a result of exposure to asbestos before MFP's bankruptcy case."  (App't Br. (Dkt. No. 14) at 73)  Appellant again relies on Motors Liquidation.  As explained above, however, this analogy does not hold, because the Manville Plan provides a mechanism to represent and pay future asbestos claimants.  Given the intertwined nature of the two bankruptcies, and the fact that the Manville Plan channeled claims against MFP such as Appellant's claim, there is no requirement that the MFP Plan provide its own mechanism to pay future asbestos claimants such as Appellant.

---

any debt discharged under section 727, 944, 1141, 1192, 1228, or 1328 of this title, whether or not discharge of such debt is waived; [and] (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived. . . ."  11 U.S.C. § 524(a).

C.   **Whether the Bankruptcy Court Relied on the Sale of MFP Stock**

Appellant argues that the Bankruptcy Court improperly relied "on Manville's funding of the Manville Asbestos Trust through the sale of MFP's stock" in deciding that the claims should be channeled.  (App't Br. (Dkt. No. 14) at 85)  The Bankruptcy Court did in fact note MFP's contributions.  The Bankruptcy Court also concluded that, "[e]ven if MFP were somehow considered a non-debtor subsidiary of Manville, Manville did not use MFP to shield its assets."  (June 30, 2016 Op. (Dkt. No. 4243) at 47, 82 Br. 11656)  As explained above, however, MFP is clearly a subsidiary of Manville.  As such, it is an entity that can have Other Asbestos Obligations channeled through the Manville Plan.  The Bankruptcy Court's decision makes this point as further evidence that the MFP and Manville bankruptcies were intertwined.  This Court sees no error in that analysis.

## CONCLUSION

For the reasons stated above, the order of the Bankruptcy Court for the Southern District of New York is affirmed.  This appeal is dismissed in its entirety, and the Clerk of the Court is directed to close this case.

Dated:  New York, New York
        September 30, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge